## INDIANAPOLIS STREET RAILWAY COMPANY
### *v.* DARNELL.

[No. 4,427.   Filed October 27, 1903.   Rehearing denied February 17, 1904.   Transfer denied April 6, 1904.]

NEGLIGENCE.—*Evidence.*—In an action for personal injuries the negligence of defendant causing the injury may be shown by direct or circumstantial evidence.   *p. 693.*

SAME. —*Evidence.* — *Inference.* — Negligence may be inferred from all the facts proved in an action for personal injuries.   *p. 693.*

SAME.—*Inference.*—*Failure of Defendant to Offer Testimony.*—Where in an action against a street railroad company for injuries sustained by plaintiff caused by defendant running its car against plaintiff's wagon, which he was driving, the defendant failed to offer any evidence as to the manner of the accident, the jury had the right to put a construction upon the silence of defendant, and draw the inference of carelessness rather than accident.   *pp. 694, 695.*

SAME.—*Evidence.*— *Street  Railroads.* —*Personal  Injuries.* — *Contributory Negligence.*—In an action against a street railroad company for personal injuries plaintiff testified that he stopped his wagon on the street railroad track awaiting the passage of a freight-train and was struck by a street car, approaching from the rear, and injured; that it was early in the morning, and but few cars were in operation; that there were obstructions at the sides to prevent him from driving off the track; that he looked down the track in the direction from which the car approached, before going upon the track, and again while on the track, awaiting the passage of the train, and saw no car approaching; that there were no obstructions to prevent a view along the track for a distance of 900 feet, and the motorman of the car could have seen plaintiff's wagon for that distance.   Defendant introduced no evidence, and plaintiff offered no evidence as to the manner of the accident except his own.   *Held*, that the evidence was sufficient on the question of negligence to support a verdict for plaintiff.   *pp. 695, 696.*

From Morgan Circuit Court; *M. H. Parks*, Judge.

Action by John W. Darnell against the Indianapolis Street Railway Company.   From a judgment for plaintiff, defendant appeals.   *Affirmed.*

*F. Winter, C. Winter, W. H. Latta* and *Oscar Matthews*, for appellant.

*B. K. Elliott, W. F. Elliott, F. L. Littleton* and *W. J. Beckett*, for appellee.

COMSTOCK, P. J.—Appellee brought this action in the superior court of Marion county against appellant for damages caused by appellant running its car against appellee's wagon and injuring his person. It is charged that appellant was negligent in the operation of its car. The trial was had in the circuit court of Morgan county, upon a change of venue, before a jury, and a verdict returned upon which judgment was rendered in favor of appellee for $6,000. It was charged in the complaint that appellee drove said vehicle upon the street car tracks of the appellant on West Morris street in the city of Indianapolis, and there stopped and waited for a freight-train to cross the street and get out of his way; that "while upon said track * * * waiting for said freight-train to pass * * * being in said vehicle * * * the defendant's car ran against the same."

Numerous errors are assigned, but in the oral argument counsel for appellant stated that the court would be asked only to pass upon the sufficiency of the evidence to sustain the verdict.

Appellant introduced no evidence. At the conclusion of appellee's evidence, appellant moved the court to instruct the jury to find for the defendant. Appellee offered no evidence but his own as to the manner of the accident. His testimony is substantially as follows: I live at 1305 Belmont avenue; am fifty-one years of age, and in the milk business. On September 7, 1900, I left home about a quarter past four in the morning. It took me about thirty minutes to drive to the Belt crossing. I saw the street car tracks on Belmont avenue, where the cars turn; and all the time after I got on Reisner street I did not see any street cars. At that time in the morning cars run out there every

Indianapolis St. R. Co. v. Darnell.

hour. After I reached West Morris street, I drove east on the north side of Morris street—north of the tracks—to Harding street. Then I drove on the car track on the north side of the street to the switch, crossed over to the south track, and drove up to the Belt on the south track. I drove within twenty-five feet of the Belt—my person was within twenty-five feet—my horse's head within fifteen feet. As I was driving across the switch I looked to see if any car was approaching from the west. I could see back beyond Reisner street, and there was no car between Reisner street and me. There was no obstruction to the view. The track is straight. There is a down grade from Reisner street to Harding street, and then it is up grade to the Belt. It is about nine hundred feet from Reisner street to the Belt. There are two tracks on Morris street. Cars going east use the south track. West of the Belt the roadway of Morris street had been worked over recently. They had put in new ties, and, instead of filling up, they had left the ends of the ties exposed, now and then, so that you could see them clear back to Harding street on the south side. The north side was very rough. Just west of the Belt there is a dead track that leads from the Belt to the switch. Just west of the Belt there were a couple of cross-ties and some gravel between the south track and the dead track, and on the south side of the track there were long pieces of iron piled up, extending back close to the sidewalk. There were two poles stood on the south side of the street, about twenty-five feet from the Belt, and these irons stuck out about three feet beyond these poles. When I drove up, there there were two vehicles standing in the north roadway, north of the north track—a two-horse wagon close up to the Belt, and a spring wagon just behind it. The switch begins about seventy-five feet west of the Belt. A long freight-train obstructed my passage. As I passed the switch the train began to pass over Morris street. I

looked back to see if a car was coming, didn't see any, and passed over on the south side and drove up to the Belt and stopped. I remained in that position from three to five minutes. I looked back twice, I think, for cars; I think I looked the last time about a half a minute before I was struck. I did not see a car at any time. When I looked I put my head out of the door of the wagon. I could see beyond Reisner street. All of the times when I looked I was sitting in the wagon. The doors of my wagon were in the center—one on each side. They were open. There was a glass all around the wagon sides, back and front, but the front glass had been taken entirely out, and the back window was drawn up, open, and hooked to the top of the wagon. This glass was about twelve inches in width, and the back door there was drawn up, and hooked on hooks put there for that purpose. Below the glass there were two doors that closed together in the middle. They were fastened. There was no room to drive a wagon south of the tracks and between them and the obstructions, and this condition was the same up to the Belt. The Belt crossing is boarded. It was the custom of the street railway company to stop their cars when nearly to the railroad, and the conductors get off and go forward and look up and down to see if there are obstructions and then motion the car across. There was no obstruction to prevent a motorman seeing me, only my milk-wagon. It was seven feet high. I was sitting in my wagon, on the south side of the wagon. I looked back twice, and saw no car. As I settled myself in my wagon, just turned around and looked up and down the Belt, and just at that time the car struck me from the rear. It is my impression that it was one-half minute after I looked the last time until the car struck me. It was a very hard blow. As it struck the wagon, knocking it east, my head and shoulders came out through the opening where the glass was till my head came down below or near where the bumper of the street car was. At that time I

saw the motorman with his hand on the brake, whirling it around as fast as he could. Then my head struck something, and the next thing that I knew I was lying on the street by the sidewalk. I did not hear the car. The noise of the freight passing over the crossing prevented my hearing the car. I did not see the car approaching. After I revived I saw the car standing with my wagon just in front of it. The next I remember I was in the ambulance. After I got home I remember the doctor setting my shoulder. The cap of my shoulder was knocked off and broken; the round bone of the shoulder was fractured; I had two or three ribs broken. I had a knot on my head, and I was hurt in the throat, and my spine was hurt. It was daylight at the time of the accident, and a clear morning. I don't know what car struck me, but none run then except those of the Indianapolis Street Railway Company. I was in bed four weeks, confined to the house about two months, and after that went about with a cane or crutch. I have regained the use of my left shoulder, but there are some adhesions to be broken up. I had a paralytic stroke seven months after the accident. I can't taste anything. I sleep poorly. I have been to the city to market with a load of roasting-ears since.

Cross-examination: I was entirely familiar with Morris street, and the location of the tracks, and the way in which the cars were operated there. I had known for a week before I was hurt of the obstructions in the street on both sides of the track, just west of the Belt Railroad. On that morning, when I got to Harding street, I turned upon the north street car track. Before that I had been driving in the roadway. From Harding street to the switch I drove on the north track. As I got to the switch I saw two vehicles in the roadway at the north side of the track. As I was passing over the switch I saw the freight-train just beginning to go over the street. I was then about twenty-five feet west of the Belt, and I there looked to

see if a car was coming. I looked out of the right door of my wagon. I saw no car. I saw beyond Reisner street. I then drove up so that my horse's head was ten or fifteen feet from the railroad. I drove the distance in a walk. I knew when and before I went in there I could not drive off the track to the south without injuring my wagon; that the obstructions of the south side of the track would prevent my driving off there. I also knew when and before I drove in there that I could not drive off that track on the north side because of the obstructions. I also knew that I could not drive ahead for probably four or five minutes on account of the freight-train. The reason in my mind when I was at the switch, on account of which I did not drive on the north side of the street, behind that spring wagon, was that it was rough there, and I did not want to risk breaking my bottles. Nothing prevented me from driving there, and I might have stopped. I knew that no car could come and occupy the north track until the freight-train passed. I also knew that any car from the west would come on the south track. I didn't think a car was liable to come. When I looked back, it was through habit, and not because I expected to see a car. After I got up to the track I stopped and stood still until the accident. The horse was gentle, and at all times under my control and management. It was being driven by me. After the horse stopped, I looked back through the opening in the back of the wagon. Nothing obstructed the view. I saw beyond Reisner street, and saw no car. I had good eyesight and hearing. The freight-train was making a great noise all the time. I knew that would interfere with my hearing an approaching car. I had good use of my limbs, and was an active man. All the time I was sitting on the seat of my milk-wagon, three feet from the back end of the wagon. Both doors of the wagon were open. The doors were opposite my feet and knees. They were wide enough so that a man could readily get through them.

The floor was seventeen inches above the ground. From my position it was one step out onto the ground. After I looked back the last time I sat facing east in the wagon. I looked up and down the Belt, and then I was facing east. I did not see the car until after it had collided with the wagon. I did not hear it. I was ignorant of its approach. Nothing prevented me from getting out of the wagon if I had wanted to do so. I knew of the custom to stop the cars at the crossing, and had it in mind when I drove in there, but I was not expecting any car whatever. I was an active man. I had no difficulty in walking. I was not depending upon the fact that it was the custom to stop before crossing the tracks.

The general rule is that in an action for personal injuries the negligence of the defendant will not be presumed. There are exceptions to this rule, but the facts do not bring the case before us within them. Some negligence of the defendant must be shown which directly contributed to the injury. This may be done by direct or circumstantial evidence; it can not be defined from any rules of evidence. It must be inferred from all of the facts of the case. A jury has the right to draw from the facts proved fair and reasonable inferences. *Hedrick* v. *Osborne & Co.,* 99 Ind. 143; *Union, etc., Ins. Co.* v. *Buchanan,* 100 Ind. 63, 72; *Terre Haute, etc., R. Co.* v. *Pierce,* 95 Ind. 496; *Indianapolis, etc., R. Co.* v. *Collingwood,* 71 Ind. 476; *Indianapolis, etc., R. Co.* v. *Thomas,* 84 Ind. 195; *Johnson* v. *Hudson River R. Co.,* 20 N. Y. 65, 75 Am. Dec. 375; *Schneider* v. *Market St. R. Co.,* 134 Cal. 482, 66 Pac. 734; *Dowell* v. *Guthrie,* 99 Mo. 653, 12 S. W. 900, 17 Am. St. 598; *Schœpper* v. *Hancock Chemical Co.,* 113 Mich. 582, 71 N. W. 1081-1084.

The evidence shows that the view on appellant's track of the appellee's wagon, from the approaching car, was clear for a distance of 900 feet. There is no evidence fixing the speed of the car at any given point of the 900

feet. There is evidence that it passed over that distance in about one-half minute, and without warning struck the appellee's wagon. The speed, from this evidence, for at least a part of the way, was therefore great. The morning being clear, and the view unobstructed, the motorman could fairly be held to have knowledge of the conditions existing at the place of the collision, and to see the appellee's peril in time to have prevented the accident by the exercise of reasonable care. It is the duty of a motorman of a street car to have it under such control that it may be stopped within a short distance if the occasion requires. From his failure to exercise reasonable care without explanation, the jury might properly draw the conclusion of negligence.

But counsel for appellant insist that there is no evidence of negligence, and that the facts proved are equally consistent with any one of three theories: (a) That of pure accident, as far as the appellant or any of its employes are concerned; (b) that of negligence on the part of the appellant; (c) that of wilfulness on the part of the appellant; and that they point to one theory no more strongly than to the other. The purpose to commit wilful injury —the commission of a crime—will not be inferred when the result of tortious conduct may be reasonably attributed to negligence or inattention. Innocence of crime is presumed. The inference of wilfulness is not equally reasonable with that of inattention. This is a fact of common observation. *Jones* v. *United Traction Co.*, 201 Pa. St. 344, 50 Atl. 826; *Elwood, etc., St. R. Co.* v. *Ross*, 26 Ind. App. 258; *Cleveland, etc., R. Co.* v. *Klee*, 154 Ind. 430.

The jury had a right to put a construction upon the silence of the appellant. The manner of operating the car was known to its employes; if the injury was due to accident, it was susceptible of easy proof. From the failure of such proof the inference of carelessness, rather than accident, might reasonably be drawn. The presump-

tion of negligence of the railroad company would not arise from the mere fact of the collision, but the jury might reasonably expect (the situation of appellee being apparent) explanation of the failure to stop the car in time to have avoided the collision.

In *Danner* v. *South Carolina R. Co.,* 4 Rich. (S. C.) 329, 55 Am. Dec. 678, it is said: "That the company did not produce witnesses to show how the damage occurred, nor explain why they omitted to do so, tends to induce the belief that they could make no defense. They had the witnesses under their control. The plaintiff may not have been present when his cattle were killed, and may not be able to discover who were the persons employed on the train when the damage was done. When a party is charged with an act or declaration, which may subject him to an action, and does not deny it, his silence is construed into an admission. The same construction may be put on a party's omission to offer testimony in his defense, when it is in his power to produce the witnesses who might exculpate him."

"It may be said, generally, however, that the person controlling the motive power of a street car must use the highest degree of care to avoid injury to a person after discovering his peril." Nellis, St. Surface Railroads, 299, and cases cited. See, also, Thompson, Negligence (2d ed.), §1404. The inference of the negligence of appellant is the only one which can fairly be drawn from the facts.

Was appellee guilty of negligence proximately contributing to his injury? He was not a trespasser. He was on a street railway track in a public street, with as much right as the railway company. He was upon the right side of the street. Obstructions left in the street by appellant made it dangerous for him to drive north of the south track, and difficult to drive south of the south track or back to the north track after getting on the switch and starting across to the south track. There were two wagons

in the way of his driving on the north side. He had no reason to believe that he would have to stop until after he had gotten on the south track. He knew that no car ordinarily ran there at that hour; that it was the custom to stop it at the crossing; that it was the duty of the motorman to give him warning; that he could be seen for 900 feet; that the car could be easily stopped, as the track was slightly up grade for several hundred feet from Harding street to the crossing. He looked three times for an approaching car—once as he went on the track and twice after he had stopped. The last time about one-half minute before the collision. He did not see nor hear the car. If he had known of the approach of the car it would have been his duty to have attempted to get off the track. He was not required constantly to look behind him. *Wabash R. Co. v. Biddle,* 27 Ind. App. 161. The wagon was plainly visible to the motorman, and without special circumstances, which do not appear, the railway company could only have run appellee down carelessly or wilfully. He may be presumed to have known this. *Tunison* v. *Weadock* (Mich.), 89 N. W. 703; *Vincent* v. *Norton, etc., St. R. Co.,* 180 Mass. 104, 61 N. E. 822. Under the most favorable view to be taken for appellant of the evidence, it could only be said that the circumstances were such that reasonable minds might draw different conclusions respecting appellee's fault, and then the question of due care was one of fact for the jury, and the jury have passed upon that question adversely to appellant's claim.

Judgment affirmed.