EDWARDS *v.* ENGADINE LUMBER CO.

1. MASTER AND SERVANT—NEGLIGENCE—PLEADING—DECLARATION
—VARIANCE.

    A declaration which alleges that the de_endant neglected to
    keep machinery for holding and moving or kicking logs in
    good repair, whereby it operated improperly by rolling the
    logs forward without the agency of a lever intended for such
    purpose, and that plaintiff was injured by a log which rolled
    over the machinery without being checked, as intended, is
    insufficient to permit proof of the fact that a valve, by which
    the machine was operated, was out of repair by reason of the
    absence of certain weights necessary to its proper perform-
    ance, subsequently found to have fallen to the ground.

2. SAME—ACTUAL OR CONSTRUCTIVE NOTICE OF DEFECT.

    The absence of such weights is not proof of negligence, where
    it appeared that the machinery had, immediately before,
    operated in a proper manner, there being no testimony tend-
    ing to show notice to the defendant.

Error to Mackinac; Shepherd, J. Submitted June 23,
1909. (Docket No. 121.) Decided November 5, 1909.

Case by James Edwards against the Engadine Lumber
Company for personal injuries. A judgment for plaintiff
is reviewed by defendant on writ of error. Reversed.

*Horace M. Oren*, for appellant.

*Cummiskey & Spencer*, for appellee.

OSTRANDER, J. It is certified that the record contains
all of the testimony. Defendant operated a sawmill. In
the mill, in the log deck upon which logs were placed in
position to be taken upon the carriage which carried them
to the saw, was an apparatus consisting of a horizontal
shaft parallel with the log carriage, at each end of which,
attached to it and standing above the level of the deck and of
the skids, was a casting designed to hold a log in position

to be taken upon the carriage, and, being reversed, to propel or kick the log towards the carriage.  The description of this apparatus in the declaration is found in the allegation that defendant, as a part of its business,—

"Maintained and operated steam kickers, which said steam kickers were composed of iron arms, situated at the end of the skids in said mill, for the holding of logs nearest the carriage, and were for the purpose of stopping logs when rolled down on the skids near the carriage, and when required to kick or roll the logs onto the carriage; said kickers being worked by steam power and operated by the sawyer, who would work a lever when desiring to roll or kick the logs from the skidway onto the carriage."

The duty of defendant as alleged was:

"To have kept said kickers in good order and repair, and especially to have kept the said kickers in such repair that when a log was rolled against them on the skid that said kickers would hold said log from rolling toward the carriage or carriage track until desired, or until it became necessary to put the log onto the carriage.  And it became and was the further duty of said defendant to have kept said kickers in such repair that, when a log was rolled on the skidways up against the kickers, they would hold the log until the lever was operated by the sawyer, which would cause the kickers to roll the log onto the carriage."

Its breach of duty:

"Yet the said defendant, not regarding its duty in that behalf, negligently and carelessly failed and neglected to keep said kickers in good repair, so that the said kickers would hold a log, when rolled up against them, until they were operated by the sawyer to throw or kick said log onto the carriage; that the said defendant negligently and carelessly permitted said kickers to become out of repair, so that at times, when a log was rolled against them, they would allow said log to roll towards the carriage or carriage track, without the sawyer or other persons having worked the lever; and that the said defendant negligently and carelessly suffered and permitted the said kickers to be and remain out of repair, as aforesaid, for a long space of time, to wit, six weeks and upwards at the time of the committing of the grievances hereinafter set forth and immediately preceding thereto."

The averment of the manner in which the injury of plaintiff occurred is:

"When said log was rolled to and against the kickers, the said kickers, being so out of repair as aforesaid, dropped down of their own accord, and allowed said log to roll over said kickers with great force and rapidity, catching plaintiff's right foot, breaking and crushing the bones thereof, and by reason thereof," etc.

Plaintiff was an employé of defendant, 27 years old, and experienced in the work of placing the logs in position for the log carriage. He testified:

"On the 15th day of June last I was required to fill the vacancy upstairs on the log deck. It was close to 4 o'clock in the afternoon that I went upstairs. I went up there to work on the deck rolling the log down, and I stood at the end of it, and I see it strike the kickers, and I went to catch it, and at that time I went to get out of the road of it— I see it was going over, and the carriage was going to catch it, and it catched my foot before I could get out of the way from it. The log was struck by the carriage, and sort of drove it inwards towards me. The log caught my foot.

"Q. You say you saw it going over the kickers? What do you mean by that?

"A. Why, it was simply going over — the kickers wasn't going to hold it. I discovered there was something wrong, and I had to get out of the road. There was not much time after I discovered there was something wrong until the log caught my foot; it was all done in an instant. * * * I never knew of any log going over those kickers before that time. I never knew of the kickers failing to hold the logs before that time. I had never been told by anyone that they did not hold. * * * The logs that I was feeding through when I started to work in the mill when it was rebuilt varied somewhat in size. There would be some quite large ones and some quite small. When I would take my canthook and start to roll a log down, if there was no log ahead of it, it would acquire considerable force by the time it got down to the kickers. I had to kind of look after a log of that kind. It was a part of my duty to see that it did not go too fast against the kicker. I knew that if it should happen to get past the kicker in any way, as the carriage was moving back and forth

there, that it might be hit by the carriage. It was a part of my duty to be careful in respect to the way that I would let these logs come up against the kicker. If there was a considerable space, clear space between where I started to roll the log and the kicker, it would be my duty with the canthook to kind of hold the log back. The reason for this was that it was customary. A fellow would naturally do it. I knew that that moving carriage there, if it happened to go over the kicker, it might injure the men on the carriage. I knew there might be some danger of the log, if it went too fast, going over the kicker. I had never had any experience of the pressing of the kicker down, still I kind of held the logs back and was careful. I did not know there was danger of pressing the kicker down. The reason I would hold the logs back was that it seemed to be customary. I reasoned it out that it might be dangerous to the men on the carriage there. * * * I handled every kind of log practically that went through the mill; logs of all sizes and all kinds. I got to be in my own judgment a very skillful deckman. I never had an accident. I think I took all the precautions a man in my position should take. I did not allow logs to go too hard against the kicker, and I was careful to hold the big logs back. I did allow logs to be rolled against the kickers when the carriage was going back and forth. I was careful to see that the logs came down when the carriage was right opposite the deck. I figured out that it was a more prudent thing to have the logs come down when the carriage was right opposite the deck than when it was off on the other side. I realized that it was necessary for me to exercise care and prudence in doing my work there on the deck. I exercised care and prudence during the time that I was working on the deck. * * * I immediately started to roll that log down. I stood in front of it. Other logs were packed right up against it. I stood at the west end, the proper place where any man had to work. That was the left-hand side looking toward the jack. I put in my canthook and rolled it towards me. I paid attention to where the carriage was at the time I started to roll it. The carriage was just turning the log. It was right back opposite the deck, turning the log when I started. It was just starting to feed. I rolled the log, or started to roll it down, just as the carriage was moving to feed. By the time it had gotten to the kickers, the carriage was

away past the deck. When I started the log with the canthook it rolled easily. The butt end of the log away from me struck the east kicker bar first. As I would roll logs onto the kicker, ordinarily, I would generally endeavor to have the two ends strike the two kicker bars at the same time. I would not always do that either. As a general thing I would do that. I usually tried to do so. The reason is that it is customary for a man to roll a log straight, to keep it as straight on the skids as possible. I knew that from my previous experience in rolling those logs down. I knew that was the proper way to keep them on the skids. I knew that was the proper way to roll them down. I do not know as I had been told so, but I had acquired that knowledge from my own experience. * * *

"*Q.* You didn't roll this log straight, did you?

"*A.* Why, I did— I could not say it was perfectly straight—no. I believe I did roll that log down so that the butt end hit the east kicker bar first. I rolled it that way instead of rolling the log straight, so that it would hit the two arms together at the same time. I was not careless in that respect at that time.

"*Q.* Well, now will you explain how it was that you did not come to roll that log down straight?

"*A.* Why, I just merely started the log, and it rolled itself. I let it go. It was pretty square on the skids; it was not necessary for me to touch it."

The kickers described in the declaration were not out of repair. No witness testified that they yielded at all to the impact of the log. They either did or did not remain in position. If they did, the end of the log went over the particular kicker bar. If they remained in position, the defendant was not negligent. It was and is the contention of plaintiff that the testimony produced established certain premises from which the jury might reasonably infer that the kicker bars did not serve the purpose they were intended to serve, and did drop down instead of holding the log. *Schoepper* v. *Chemical Co.*, 113 Mich. 582 (71 N. W. 1081). His theory is that it is not probable that if the kicker bars had remained in position, the end of the log would have gone over. It is probable, therefore, that the kicker bar against which the log was

thrown did not remain in position. If an efficient cause for its dropping down or yielding is shown, the question whether it is more probable that it did drop down than that the log went over it in position is a question of fact. If the alleged efficient cause is a negligent cause, for which the master is responsible, the plaintiff's case is made out. In support of this theory, plaintiff introduced testimony tending to prove that in a room below the one in which the kicker bars were was a steam cylinder operating a piston connected with one of the kicker bars. The movement of the piston in this cylinder operated the kicker bars. The movement to reverse the bars and propel the log towards the carriage was controlled by the head sawyer by means of a lever connected with a valve stem, which valve, in turn, governed the introduction of steam into the cylinder. It was a vertical cylinder, receiving steam both above and below the piston head. To release the kicker bars and propel or kick the log towards the log carriage, the movement of the piston was up, and to bring the kicker bars to position for holding logs its movement was down. There was attached to the valve stem a weight. In some mills a spring is used instead of a weight. The movement of tripping the kicker bars lifts the valve stem, permitting steam to enter the lower part of the cylinder. When the movement is completed, the stem should return to the position from which it started, permitting steam to enter the upper part of the cylinder. The weight or spring upon the valve stem is for the purpose of bringing or starting it back to its original position. Testimony was introduced which, viewed most favorably for plaintiff, establishes the fact that immediately after the plaintiff was injured, the weight or weights which had been attached to the valve stem were on the floor underneath the place where they had hung. When or how they were detached is not shown. It does not appear that they had ever before been found detached. The apparatus was out of repair, if at

all, because the weights were absent when the injury occurred. It is not claimed that the apparatus with the weights attached was not a proper machine. There is testimony tending to prove that upon three prior occasions a log had gone over the kicker bars, and that upon one of these occasions the general manager of defendant was in the mill and could have seen it. How the absence of the weights might have been the efficient cause of the dropping down of the bars is attempted to be shown by the following testimony of one, not an engineer, who knew about the operation of the steam kickers by observation only:

"*Q.* Now, if there were no weight there, or if that weight was taken off, what would be the effect?

"*A.* Why, it might—it would weaken it so that it might possibly let a little steam get under.

"*Q.* And what effect would that have?

"*A.* Why, it would raise the kickers, if there was enough steam got under."

In various appropriate ways the defendant raised the questions, *first*, that the declaration was not so framed as to permit proof of the absence of the weights from the valve stem; *second*, that the testimony did not tend to prove the negligence of defendant. We are of opinion that the rulings upon both should have been in favor of defendant. The declaration directed and limited attention to kicker bars, which it particularly described. The duty and breach of duty assigned relate to the kicker bars, presumably as described. Undoubtedly the plaintiff would have been permitted to amend the declaration upon such terms as to continuance, or otherwise, as the court should impose. We discover no showing of surprise, and no request for a continuance. Under the circumstances, we might well decline to reverse the judgment upon this ground.

But we find no testimony tending to prove the negligence of defendant. An admittedly proper device was in use by it, and in the respect now brought to attention it

does not appear that it was ever before in fault, or in any manner infirm.   There was therefore no proof of actual knowledge of infirmity, and no ground for imputing knowledge.   If we assume, as we must, that the kicker bars were in position when the plaintiff started the log down upon them, we must also assume that after the last reversal of the bars by tripping, the valve stem descended, the steam was admitted to the upper part of the cylinder, and the piston head was forced down so as to bring them to position.   This was the last time that in the operation of the apparatus the weights performed the function of pulling the valve stem down so as to permit steam to be admitted to the upper part of the cylinder.   It was steam, and not the weights, which operated the piston, and brought the bars into position to hold the log.   Every presumption favors the theory that when last called upon to act, which must have been very soon before plaintiff was hurt, a proper apparatus performed in a proper and accustomed manner.   It does not appear that it was possible for any force to be applied to valve stem or valve to reverse the action of the steam—to lift the stem—except the force applied in tripping the kicker bars, unless some one meddled with the apparatus.   And if, after last bringing the kicker bars to position, steam from any cause escaped into the lower part of the cylinder to an extent sufficient to move the piston, it would seem to be clear that the position of the kicker bars would be changed accordingly.

The defendant was entitled to have a verdict directed in its favor.   The judgment is reversed, and a new trial granted.

HOOKER, MOORE, MCALVAY, and BROOKE, JJ., concurred.