SPENCER *v.* PHILLIPS & TAYLOR.

1. NEGLIGENCE — PERSONAL INJURIES — CONTRIBUTORY NEGLIGENCE
   —FAILURE TO DIM LIGHTS—EVIDENCE—QUESTION FOR JURY.

   In an action for personal injuries caused by a collision
   in the nighttime between the automobile, going east, in
   which plaintiff was riding, driven by her husband, and de-
   fendant's taxicab, going west, where the collision occurred
   on the south side of the road, testimony by her husband
   that he dimmed his lights and turned from the center
   of the road 120 feet west of where the collision occurred,
   *held*, to present a question of fact for the jury on the
   issue of his contributory negligence, and the trial judge
   was in error in directing a verdict for defendant.

2. SAME—VIOLATION OF STATUTE NO BAR TO ACTION UNLESS A
   CAUSAL CONNECTION SHOWN.

   That plaintiff's husband had not yet received his license,
   although paid for, and he was driving his car without
   license plates at the time of the accident, would not
   bar her right of action, since, even if he was technically
   guilty of violating the motor vehicle statute and therefore
   guilty of negligence *per se*, it was in a particular which
   in no sense did or could cause or contribute to the
   accident.

Error to Genesee; Black (Edward D.), J.   Sub-
mitted April 11, 1922.   (Docket No. 50.)   Decided
July 20, 1922.

Case by Ada L. Spencer against Phillips & Taylor, a
copartnership, for personal injuries.   Judgment for
defendants on a directed verdict.   Plaintiff brings
error.   Reversed.

*Selden S. Miner* and *Leon F. Miner* (*Roy E.
Brownell,* of counsel), for appellant.

*Chandler & Friegel,* for appellees.

219—Mich.—23.

STEERE, J.   Plaintiff was severely injured while riding from Owosso to Flint with her husband and children in an automobile by a collision between her husband's car and a taxicab being driven from Flint to Owosso by a driver of defendants named Ordway. This action was brought to recover damages for her personal injuries imputed to the negligence of Ordway. Upon the trial the court directed a verdict for defendants.   Defendants are copartners operating as a common carrier for hire a line of automobiles between Flint and Owosso running on a published schedule, making extra trips on Saturdays and Sundays.   Plaintiff is a married woman over 40 years of age living in Flint with her family.   Her husband, William Spencer, a carpenter by trade, owned a Ford touring car and was an experienced driver.   He had the car overhauled and put in good condition during the winter, and in the spring, on April 6, 1918, applied and paid for a license which he did not receive until April 15th, the day following the accident.   In the meantime he put a placard on this car stating "License applied for."   On Sunday, April 14, 1918, he took his family in the car on a trip to visit Mrs. Spencer's parents who lived near Owosso.   They had with them 5 of their children ranging in age from 2½ to 17 years.   Starting home that evening at about 8 o'clock they passed through Owosso and continued east on the Owosso road to Flint, an east and west thoroughfare connecting the two cities, improved as a State award road, graded and graveled for a width of about 20 feet between gutters, or side depressions about five inches in depth.   The two cities are about 25 miles apart.   Seventeen miles west of Flint is a highway crossing called "Phelps' corner."   Just east of this crossing and opposite the residence of Mr. Phelps, located on the north side of the road, their car collided with a taxicab of defendants' going west

with 5 passengers, and driven by Ordway who knew the road well and was then making his third round trip on that day. He gives the time of the accident 'as "shortly after 9 o'clock," and of his leaving Flint "between 8 and 9 o'clock." Other witnesses time the accident as late as 10 o'clock.

The collision was undisputedly a violent and serious one, breaking and disabling both cars so that they remained unmoved until other cars came for them. No one in the taxicab was thrown out or seriously hurt. Spencer had an eye put out and fell unconscious, in which condition he remained until the following day. Plaintiff who sat beside him holding their baby was found lying unconscious under the right-hand running-board of their car and taken into Phelps' house. A physician called to attend them found her jaw was broken and that she had sustained other serious injuries. It is undisputed the collision occurred on the south and right side of the road to plaintiff's car, in the direction it was being driven.

There was abundant testimony tending to show the negligence of the taxicab driver, undisputed, as the trial court stated, but the court directed a verdict for defendant on the ground that Spencer was shown by his own testimony to be guilty of contributory negligence in not dimming his lights "in seasonable time to prevent (permit) the safe driving of defendants' car." Of this the court further said:

"Mr. Spencer, at the time that he was in the center of the highway, driving at a point, the greatest distance, the testimony shows, to be 120 feet in a west line from the point of the accident, or 120 feet from the place of the accident, by drawing a line from where the accident occurred, north across the highway—the undisputed testimony shows by Mr. Spencer, he being there, that he did not dim his lights, but in turning to the right he dimmed his lights and continued along on the south side of the highway. The testimony, undisputedly, of Mr. and Mrs. Spencer

both was that the lights from the defendants' car was shining into their faces and blinding them at that time."

Apparently the court predicated contributory negligence on the proposition that Spencer did not dim his lights until the approaching car was within 120 feet of him. The substance of testimony given by Spencer and other occupants of his car upon the subject is that shortly before they crossed the intersecting highway at Phelps' corners they saw a single, approaching light in the distance and just after crossing he swung from near the center of the road to the right or south side, dimming his lights as he did so, and continued at reduced speed close along that side of the road leaving the approaching car ample room to even pass along the center, but when close to them its driver quickly swung diagonally across to the south side of the road and struck them. Ordway admits turning across to the south side of the road just before the accident. His explanation on direct-examination was—

"When he (Spencer) got by the corner, just a little the way it looked, he came to the north side of the road, and he drove a little distance, I could not say just exactly how far the lights were in front of me, I could not see, and he got right up to me. I was thinking there was something going to happen; he was either going to hit me head on or I had to do something to get out of the way, so I just turned to my right. That is the way it did occur. * * *
"Q. Could you tell how far you were at that time west before you turned south as you state?
"A. About 200 feet."

On direct-examination Spencer said in part:

"As I came across the four corners, I was in the center part of the highway, the traveled part of the road, and going about 12 miles per hour. I saw one light approaching me, * * * a very bright light. * * * I could not distinguish any-

thing but the light. * * * I turned out of the center of the highway about 120 feet west of where the accident occurred. * * * I turned to the right. As I turned out of the road, to turn out of the road, I threw the switch over on to the dimmer side. * * * It dimmed the lights. I had two lights on my automobile. * * * It (defendants' car) was approaching me all the time. It appeared to be coming rather fast. * * * I think it was coming about 25 miles per hour. * * * After it got pretty near to me it turned across the road, south across the road in front of me, turned so quick I could not hardly tell what did happen, just a short time between then and the accident, just a second after it turned the accident happened. * * * I didn't know anything after that. I was unconscious."

On cross-examination:

"I saw a light coming directly towards me. I could not tell exactly how far it was. It was up the road quite a long ways; I noticed they only had one light. * * * As soon as I got just by the corner, just after I saw them, I turned by the right—the street on the right side of the road, dimmed my car and proceeded. * * * When I put on the dimmers and started to use the foot brakes they were down the road a considerable distance." * * *

Plaintiff testified in part as follows:

"As we were approaching the Phelps corner I was riding with him in the front seat with my 2½ year old baby in my lap. * * * After we had passed the intersection of the highway I saw one light approaching; I could not tell how far it was away, it was some distance. After we passed east of the intersection of the highway my husband applied his dimmers and turned out the right hand side of the road, shortly after we passed the intersection of the highway the right hand wheel was on the edge of the grass; the light from the east continued approaching. After we had turned to the right and applied our dimmers and the machine slowed down this light seemed to be coming directly toward us, then it made a quick turn in a southwesterly direction, turned

across the road, in an instant the accident happened; all I could see was the light, I could not see the car."

On cross-examination:

"Q. Now, after you turned out to the right, did it or did it not blind you?

"A. Not right away, it did shortly after we turned out; I don't know how far the cars were apart. * * *

"Q. You don't remember; you were interested; you don't remember just what did happen?

"A. Not after the car came across in front of us, it happened so quickly I didn't know anything after that, I was not conscious that I was being thrown out of the car."

Their daughter Verne, then 17 years of age, testified in part:

"I noticed him (Spencer) turn out to the side of the road and dim his lights. Before that he was traveling in the center of the highway.

"Q. Could you tell us how far the light was that was approaching from the east, what distance from you when you noticed your father turn out to the side of the road?

"A. No, sir, I would say it was quite a distance. My father turned to the right. * * * I continued noticing the light approaching us from the east. It had just one light, which was very bright. It did not become dim in any way until the crash came. After my father turned out he was on the right side of the road. The other car seemed to be coming directly towards us; it seemed to be in the center of the highway; * * * It turned directly in front of us toward those barns. Before the time it turned, I could not say what kind of a machine was in back of this light; I could not say whether it was a motorcycle, automobile or what it was. After it turned I knew that it was a car then."

On cross-examination:

"Q. Did your father change the course of his car at all after the other car had changed its course?

"A. No, sir, we were nearly stopped then, our car

was nearly stopped when the car turned and clashed into us."

Both of these cars were Fords, with the electricity for the lights supplied from the magneto, their brightness increasing or decreasing according to the speed of the motor.    Spencer had provided his with a dimmer equipment.    Defendant had no dimmers. After leaving Flint on that trip Ordway stopped on the road and spent some time fixing or trying to fix his lights.    The testimony is undisputed that when the accident occurred but one of his lights was burning.    Taking Spencer's testimony as true, he turned to his right side of the road and dimmed his lights when the taxicab was a sufficient distance away to at least make it a question for the jury whether or not he did so "within a reasonable time to permit the safe driving of defendants' car" so far as his lights were concerned.    The issue of Spencer's contributory negligence was an issue of fact to be determined by the jury.

A further point, raised in court below but not passed upon, and renewed here, is that in violating the automobile law by driving his car without a license Spencer was guilty of negligence *per se,* which precludes plaintiff from recovery.    So far as extenuating circumstances go Spencer was, in his technical violation of the statute, situated similar to Ordway who had applied for a chauffeur's license some time before the accident but did not receive it until after. Spencer had made proper application, paid the imposed specific tax and done whatever was required to entitle him to a license for his car.    In lieu of his license plates he labeled it with a statement of that fact.    Conceding, however, that he was technically guilty of violating the statute and therefore guilty of negligence *per se,* it was in a particular which in no sense did or could cause or contribute to the accident.

The injury intended to be prevented by the law violated is not the injury complained of here. If it were, a presumption might arise that its non-observance caused the accident and resulting injury.

The question just as presented here, to defeat recovery, has not been squarely passed upon by this court and the authorities elsewhere are not entirely in harmony upon it, as said in *Stuch* v. *Town,* 178 Mich. 477. We think, however, the citations there made as bearing upon that question tend to the view that neither a plaintiff or defendant can avail himself of the bare fact the opposite party was guilty of violating a statute, unless it caused or contributed to the injury. In 1 Cooley on Torts (3d Ed.), p. 269, it is said:

"The principle is, that to deprive a party of redress because of his own illegal conduct, the illegality must have contributed to the injury."

In *Hughes* v. *Atlanta Steel Co.,* 136 Ga. 511 (71 S. E. 728, 36 L. R. A. [N. S.] 547, Ann. Cas. 1912C, 394), it is said in an exhaustive opinion citing numerous cases and modifying previous decisions of that court:

"The mere fact that the plaintiff on the one hand, or the defendant on the other, was engaged in violating the law in a given particular, at the time of the happening of the accident, will not bar the right of action of the former, nor make the latter liable to pay damages, unless such violation of law was the efficient cause of the injury."

In *Sutton* v. *Town of Wauwatosa,* 29 Wis. 21 (9 Am. Rep. 534), after discussing the conflicting authorities the court says of those holding violation of the law will not avail unless causal connection is shown:

"It seems quite unnecessary, if indeed it were possible, to add anything to the force or conclusiveness of the reasons assigned in some of these cases in

support of the views taken and decisions made by the courts. The cases may be summed up and the result stated generally to be the affirmance of two very just and plain principles of law as applicable to civil actions of this nature, namely: *First*, that one party to the action, when called upon to answer for the consequences of his own wrongful act done to the other, cannot allege or reply the separate or distinct wrongful act of the other, done not to himself nor to his injury, and not necessarily connected with, or leading to, or causing or producing the wrongful act complained of; and, *secondly*, that the fault, want of due care or negligence on the part of the plaintiff, which will preclude a recovery for the injury complained of, as contributing to it, must be some act or conduct of the plaintiff having the relation to that injury of a cause to the effect produced by it."

These conclusions are well sustained by the great weight of authority and the better reasoning. The case is therefore reversed, with costs to plaintiff, and a new trial granted.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.