GLINSKI *v.* SZYLLING.

Automobiles—Guest Passengers.

   Verdict and judgment for defendant hosts in guests' actions
   for injuries received while in defendants' car as it collided
   with an oncoming car on a curve is affirmed, under record
   presented, showing driver's disregard of protests as to ex-
   cessive speed, pavement surface in poor condition, unusual
   weather conditions, high and gusty wind velocity, and steering
   apparatus that tended to vibrate.

Black and Voelker, JJ., dissenting.

Appeal from Wayne; Fitzgerald (Neal), J.  Sub-
mitted June 3, 1959.  (Docket Nos. 24, 25, Calendar
Nos. 47,727, 47,728.)  Decided November 25, 1959.

Case by Matteo Glinski against Joseph Szylling
and Jadwiga Szylling for personal injuries sustained
while riding in defendants' automobile.  Similar ac-
tion by Sophie Glinski.  Cases consolidated for trial
and appeal.  Verdict and judgment for defendants.
Plaintiffs appeal.  Affirmed.

*Albert M. Colman,* for plaintiffs.

*William J. Eggenberger,* for defendants.

Black, J. (*dissenting*).  To the profession these
are known as guest passenger cases.*  They were

---

References for Points in Headnotes

5A Am Jur, Automobiles and Highway Traffic § 530 *et seq.*

* The jury specially found, on disputed facts and proper instruc-
tions pertaining thereto, that plaintiffs were transported guests within
meaning of the proviso of the act (CLS 1956, § 257.401 [Stat Ann
1952 Rev § 9.2101]).

consolidated for jury trial and resulted in general and special verdicts in favor of defendants. Judgment for defendants having entered, plaintiffs unsuccessfully moved for a new trial. Plaintiffs appeal and present 4 appellee-accepted questions for review, the foremost of which assigns error on refusal of the trial judge to grant certain instructional requests dealing with the precedently known condition of the steering gear of defendants' automobile.

Mr. and Mrs. Glinski, riding with Mr. and Mrs. Szylling in the Szylling car with Mr. Szylling at the wheel, left Ann Arbor March 11, 1956, for Orchard Lake via the Pontiac Trail. The Trail northeast of Ann Arbor—that being the general direction of travel of the Szylling car—is paved with asphalt and is an ordinary 2-lane country road. It is continuously replete with hills, dips and sharp curves. At the time the pavement surface was in poor condition, on account of the spring breakup, and "chuck holes" regularly were encountered. The wind velocity was unusually high (it was estimated by Mr. Szylling at about 50 miles per hour), and the gusts threw or veered the car noticeably and regularly prior to the collision we are to describe.

Mr. Szylling was in a hurry. He drove, despite the conditions and certain protests of his wife, at a speed of approximately 55 to 60 miles an hour. Such was the estimated rate of speed as the car approached and partially entered the curve Mr. Szylling was unable to negotiate. Having failed to observe a "curve" sign and the sharpness of the ensuing bend of the highway, Mr. Szylling found himself in trouble. He finally applied the brakes of the car with result of its veering, quite out of control in the course of desperate deceleration, to the wrong side of the highway where it collided with another car, approaching from the opposite direction, the operator of which had driven entirely to his right-

hand highway shoulder in abortive effort to get out
of the imminent path of the oncoming Szylling car.
The collision inferentially, if not manifestly, was
due to the combination of too-high speed under the
circumstances, the condition of the roadbed, the
sharpness of the curve, the unusual weather condi-
tions, and, in general, to Mr. Szylling's want of ade-
quate control of the car.

Three special questions were submitted to the jury
under the statute. Questions 2 and 3 only bear upon
the present appeal. They read:

"Did Mr. Szylling drive his automobile with a
wilful and wanton and reckless disregard of the
safety of himself and his passengers?"

"Was Mr. Szylling guilty of ordinary negligence
as distinguished from wilful and wanton miscon-
duct?"

The jury, having returned a general verdict for
defendants, answered "No" to the first quoted ques-
tion and "Yes" to the second.

Other facts necessary to determination of the ap-
peal and understanding thereof will receive attention
in the body of the ensuing opinion.

*First:* The principal issue tried below was wheth-
er a case of actionable gross negligence had been
made out under the mentioned statute. Aside and
apart from the testimonial facts and the related ques-
tion of jury instruction we are to consider, the trial
judge was of opinion that the proof presented a ques-
tion of fact with respect to presence or absence of
such negligence. No question on that score is raised.
However, and here we consider the salient question
brought up for review, the trial judge refused, erro-
neously in my view, to grant plaintiffs' timely re-
quests to charge numbered 24 and 25, reading respec-
tively as follows:

24. "CLS 1956, § 257.683 (Stat Ann 1952 Rev § 9.2383) provides that a driver shall not drive an unsafe vehicle upon the highway, that it must be free of all known defects."

25. "I instruct you that you may consider the driver's admitted knowledge of vibrations in the steering wheel between certain speeds, as bearing upon the driver's wilful and wanton misconduct."

Requested instruction 25 brings us to consideration of certain facts which are undisputed.

The steering apparatus of the Szylling car was not in good condition. Mr. Szylling testified:

"*Q*. Which car were you driving on this day?

"*A*. Plymouth, 1955. * * *

"*Q*. Was it in good condition?

"*A*. It was not in perfect condition.

"*Q*. What was wrong with it?

"*A*. Some vibration between 40 and 50 miles an hour.

"*Q*. I see. Tell me a little bit about that? Do you mean to say that when your speed got up to 40 or 45 miles per hour—

"*A*. (Interrupting) Yes. Between 40 and 45 miles, there was very strong vibration. And I give this car for adjustment just a week before, and the adjustment didn't help it. Then, on Saturday, when I came to service station, they told me to come out Monday to adjust it. It means on 12th of March. But, on the 11th there was an accident.

"*Q*. In other words, before you had a chance to have this situation corrected, the accident took place?

"*A*. Yes.

"*Q*. How long had you known about this condition of the car, that it vibrated?

"*A*. About 6 weeks, it was. * * *

"*Q*. And when it vibrated, what happened to the car itself?

"*A*. Well, it was inside vibration I felt. I didn't feel vibration in the wheels, or in the whole body,

but it was inside vibration; for instance, steering wheel vibration was very strong. * * *

"*Q.* Did you encounter any of this vibration on the steering wheel on the day of this accident?

"*A.* Sometimes."

There is some testimony in the record of similar import, including definite admission of Mrs. Szylling that she, having driven the car previously, knew about the condition of its steering equipment. She testified in such regard:

"*Q.* Had you driven that car, that same car, in the last 2 weeks before the accident?

"*A.* Oh, yes. * * *

"*Q.* You knew about the fact that there was something wrong with the steering?

"*A.* That is right.

"*Q.* You knew that the day of the accident, before you went on this trip; is that right?

"*A.* Well, it was a long time, this jumping in the wheel; and we checked up and they changed the tires. And just all the time it was just trembling in the wheel. * * *

"*Q.* You mean, the wheel trembled in your hand?

"*A.* Yes. * * *

"*Q.* You didn't tell the Glinskis that there was this vibration in the wheel between 40 and 45?

"*A.* No.

"*Q.* You didn't tell them that before they went on this trip?

"*A.* No.

"*Q.* But you knew about it?

"*A.* Well, we knew that several months. * * *

"*Q.* You had another car you could have used, couldn't you?

"*A.* Yes. We could use it. It was an old car. It was an old car."

The trial judge considered, on motion for new trial, the question now scrutinized. He gave as reason for denial of quoted request 25 his view that "there was

no testimony in the case that would entitle the jury conceivably to find any causal relation between this vibration and the accident."

Here I disagree with the trial judge's view of these undisputed facts. Without doubt the steering apparatus of the modern motor car is its most important safety feature. Safety and life of one and usually several invariably depends on and rides with its perfect and responsive functioning under all ordinary as well as extraordinary motoring circumstances. To drive a motor car on modern highways, at a high rate of speed and with precedent knowledge that its sole means of guidance is out of repair or, at very least, is seriously out of adjustment, is evidence of negligence (*Bathke* v. *City of Traverse City,* 308 Mich 1; 5A Am Jur, Automobiles and Highway Traffic, § 252, pp 385, 386). The cited text, under heading "Steering Mechanism," states the rule as follows:

"In view of the fact that an automobile with a defective steering gear is a dangerous instrumentality, an operator of an automobile who drives it on the highway with knowledge that the steering gear is defective and an owner who knows of such defect yet permits or directs another to drive such car without warning him of such defect is guilty of negligence and liable for whatever damage or injury is proximately caused by the defect in the steering gear."

In a guest passenger case presenting, as here, certain compounded elements of causal driver-negligence plus fair inference of causation linking a provenly faulty and already known condition of the steering apparatus with the pleaded injurious result, the inference and the condition may well be found, by the fact trier or triers, as having completed the bridge leading from ordinary negligence to statutory gross negligence. Indeed, according to

some jurisdictions, proof and inference of such nature is sufficient—the owner or driver having knowledge, as here, of the condition and having failed to advise the guest thereof—to create an issue of wilful and wanton misconduct under corresponding guest statutes. (See annotation, 23 ALR2d 539, 561, 562, 563; "Liability of owner or operator of motor vehicle for accident resulting from alleged breaking of or defect in steering mechanism.")

This brings up the question of causal connection, a question I would approach by the road Mr. Justice SMITH cleared for us in *Indiana L. M. Ins. Co.* v. *Matthew Stores, Inc.*, 349 Mich 441, 444 as follows:

"At the one extreme, it is clear that the happening of an accident alone is not evidence of negligence. Something more must be shown than the mere happening. At the other extreme, it is clear that we do not require direct evidence to establish each of the issues in a negligence case. In fact it is an unusual case where none of the issues confronting the jury (including duty, breach, and causal connections) is established, at least in part, by a process of inference from relevant and established facts. To the degree that we employ such a process of inference we are using circumstantial evidence. We do it constantly. The law would be paralyzed without it."

In the cases before us the trial judge ruled, as a matter of law perforce, that there was an absence of testimony—and that necessarily means an absence of permissible inference from testified circumstance—that the known condition of the steering mechanism of the Szylling car contributed to Mr. Szylling's want or loss of car-control and hence to the collisive result. No explanation was given. Why was the rule pertaining to fact-inference from fact-testimony instructionally applied, to the causative effect, if any, of the elements of high wind and chuck-holed road surface, but was not so applied—

on request—to the condition of mechanical disrepair? There was no *testimony* that car-veering gusts blew at the time or immediately after the Szylling car entered the curve of misfortune. Neither was there *testimony* that the road surface in the causal vicinity was seriously or otherwise pockmarked. Yet the trial judge properly instructed the jury, necessarily on strength of the rule of fair inference, that the jury should determine the question of presence or absence of statutory gross negligence from these collective factors. He should, due request having been made, have instructed the jury similarly with respect to the circumstantially inferable contributory factor of poorly responsive steering. Why? Because the testimony of each defendant tends circumstantially to connect, in part at least, the faulty condition of the steering mechanism with the collision as a contributory cause.

The condition of the steering was so bad that Mr. Szylling found it necessary to avoid driving at speeds between 40 and 45 miles per hour. He solved the difficulty by driving faster. Here is his testimony in such regard:

"*Q.* Now, you testified this afternoon that you avoided speeds between 40 to 45 miles an hour because of the effect of this trembling in your steering wheel?

"*A.* Yes.

"*Q.* As a matter of fact, you did feel some trembling in your steering wheel that day; didn't you,— when you were going between 40 and 45 miles an hour?

"*A.* Yes.

"*Q.* So that in those stretches of the road where you were going 40, 45 miles an hour, you felt it?

"*A.* Yes.

"*Q.* And you say you had to make a choice to go less than 40, or more than 45?

"*A.* Yes.

"*Q.* And your choice was to go more than 45?
"*A.* Yes."

The ruling below amounts in so many words to a judicial finding—in a case where the judge is not the authorized fact-finder—that the defective condition of the steering apparatus neither conduced nor influenced, even in small part, the driver's want of safe car-guidance throughout the final searing seconds of the crisis his combined acts of negligence had brought upon him and his passengers. It is to say (I repeat as a matter of law) that the collision would have occurred even if the steering equipment had been in good repair and had answered precisely the driver's presumptively desperate efforts to avoid disaster.* The assertion leads to invasion of the province of the jury and, there being no exceptional or exempting circumstances, is contrary to the general rule that the question of causal connection is one for determination of the triers of fact (*Spencer* v. *Phillips & Taylor,* 219 Mich 353; *Beebe* v. *Hannett,* 224 Mich 88; *Arvo* v. *Delta Hardware Co.,* 231 Mich 488; *Comstock* v. *General Motors Corp.,* 358 Mich 163).

Such general rule is by no means new. It is firmly rooted in the established law of negligence. Cooley and Prosser, writing in separate centuries, so declare. So do the modern authorities in which this question of causal connection, between defective steering apparatus and loss of control of a motor car, has been considered. Cooley wrote (Cooley on

---

* Does this Court have the right to affirm, on the herein quoted proofs, that Mr. Szylling was able to direct the course of his car— upon and after hitting the curve and during frantic retard of his rate of speed—as well with the steering gear in its testified condition as he would have guided it with the mechanism in a condition of proper repair and adjustment? Unless we can so affirm, it is clear that the trial judge should have instructed the jury according to the substance at least of plaintiffs' quoted requests.

Torts (2d ed), p 81)* that "The question of proximate cause is usually for the jury upon all the facts." and, 7 decades later, Prosser concluded his chapter on proximate cause this way (Prosser on Torts [2d ed], § 50 ["Functions of Court and Jury"], p 282):

"In any case where there might be reasonable difference of opinion as to the foreseeability of a particular risk, the reasonableness of the defendant's conduct with respect to it, or the normal character of an intervening cause, the question is for the jury, subject of course to suitable instructions from the court as to the legal conclusion to be drawn as the issue is determined either way. By far the greater number of the cases which have arisen have been of this description; and to this extent it may properly be said that 'proximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case.' "

So far as concerns the direct question in the instant case, the authorities will be found gathered in the above identified annotation under heading "Proximate Cause" and this summary (23 ALR2d 539, 543, 544):

"Whether a defect in the steering apparatus or the negligence, if any, of the driver, or some other cause, was the proximate cause of the injury, is usually a question for determination by the jury."

In my view the trial judge erred reversibly in refusing to grant plaintiffs' quoted requests to charge, either as presented or in substance. In so ruling it is noted that nowhere in his charge did the judge touch upon or deal with the subject of such requested instruction.

---

* Cooley, Torts (2d ed), p 81, footnote 2, incorporated in text of 1 Cooley, Torts (3d ed), p 111.—REPORTER.

*Second:* Mr. Justice SMITH, writing to affirm, makes several points to which I now give attention by means of quotation and comment.

### A.

Referring generally to the quoted testimony, Mr. Justice SMITH says this:

"First of all, we note  *  *  *  that, prior to trial there had been no assertion of a defective mechanism. Nothing was pleaded as to defective steering gear, nor was any allusion made thereto in the pretrial statement or its amendment."

*Comment:* True, nothing appears in either declaration, original or amended, or in the original and supplemental pretrial statements, about the condition of the steering mechanism of defendants' car. As often occurs—even in the best regulated of trial families—, the condition (it was a pure matter of evidence distinguished from pleading) was first discovered in the course of cross-examination of the only parties having knowledge of such condition. But *the testimony to such condition came in without objection,* addressed either to the pleadings or pretrial statements or otherwise. That testimony is an important part of the original record which the parties have brought here, and they have included all of it—without reservation—in their respective appendices.

No party or counsel objected to consideration of such testimony below. No motion or request to charge challenged its entry into the juryroom. No party or counsel objects to its consideration now, for the purpose of determining the merit or want of merit of plaintiffs' requests numbered 24 and 25. These technical questions have been raised exclusively by my Brother and, in such circumstances, I do not care to join in an opinion which would create a hitherto unknown risk to be assumed by the parties

on review of ordinary law cases, *viz.*, that the pleadings or pretrial statement have not covered or included—generally or otherwise—an evidentiary factor conjoined with a request to charge which both parties have approved as being properly before us for meritorious consideration.

The trouble with this judicially-manufactured objection is that the pleadings and pretrial statements were accepted below, as they are here, without question as to the generally triable scope thereof. If, now, such instruments are to affect consideration of the stated issue of causal connection, so must they correspondingly affect other units of plaintiffs' allegation and proof of statutory gross negligence, such as the condition of the highway surface and the unusual weather conditions. The latter, like the subject of defective steering, are not touched upon in the pleadings and pretrial statements.

### B.

Now to the direct point of conflict here. My Brother holds that there is no testimony, direct or circumstantial, which would have justified submission of this requested issue of causal connection to the jury. He says the proof in such regard is a "classic" example of "negligence in the air."

*Comment:* The quoted polemic is built in entirety on the miry ground—ground which in my judgment is fact-erroneous—that this collision occurred when the speed of the Szylling car was above the rate (40 to 45 miles per hour) which under the testimony produced the "very strong vibration;" "this jumping in the wheel." Mr. Justice SMITH reaches his conclusion by finding—yes, as a matter of fact from selected testimony—that the rate of speed "at the time of the accident" ranged from 55 miles per hour to "between 60 and 65 miles per hour." It will be noticed that such finding has been made on strength of a

quotation from one of the briefs and that the quotation is but a part—a strained part favoring defendants' case—of the ultimate fact testimony. . Here, meeting my Brother's errant conclusion, is Mr. Szylling's exact testimony to the point (quoted from appellees' appendix) :

"*Q.* Can you give us an estimate, if you know, how fast your car was going at the time of the impact with the other car?

"*A.* I can't tell. I believe it was very low speed, because I braked all the time, I braked. * * *

"*Q.* Can you give us some estimate of the speed?

"*A.* No, I cannot. Maybe it was 10; maybe 15; maybe 5 miles per hour. I don't know."

Further discussion is quite unnecessary. A jury having been sworn to determine all issues of fact, the trial judge had no right to find or rule that the condition of the steering mechanism did not (during part or all of the moments of frantic and futile deceleration of the car as it swept into and partly around the curve of disaster) contribute, in some degree, to Mr. Szylling's inability to control his car safely. The oncoming driver yielded to Mr. Szylling all of the pavement for maneuver and timely recovery of control, yet several factors shown in evidence prevented or interfered with such vain effort. One of these factors might well have been the "jumping" steering wheel. It was "jumping," prima facie at least, during imminent approach of the Szylling car to disaster.

If the testimony quoted above shows no more than "negligence in the air," then a great quantity of that ethereal vacuity has been wafted into Michigan jury-rooms, with the steady blessing of this Court. I, however, do not view the testimony as quite so aerified. Thus I would hold that the jury rightfully could have found that the stated combination of

events, including the circumstantially established want of sure steering control of the car *when that control was most vitally needed,* united together in making up a case of actionable wilful and wanton misconduct of the defendant driver.    Why?    Because the jury, properly instructed, was entitled to find that both defendants could and should have foreseen the tragic effect of mechanically poor steering when their car was driven in these collective circumstances of negligence.

In my view plaintiffs were entitled to the requested instructions, either in form as requested or in substance.    I therefore vote to reverse and remand for new trial.

VOELKER, J., concurred with BLACK, J.

SMITH, J.    We have been alert to preserve the right of trial by jury.    To this end we have, upon occasions, remanded for new trial cases in which it has seemed clear to us that the trial court has, upon motion, improperly directed a verdict.

In so doing, however, we do not lose sight of the fact that there is also a constitutional right not to have a question determined by a jury in certain circumstances.    The facts before us present such a case as to the argued defect in the steering gear of the defendants' car.    It is a classic example of negligence in the abstract, negligence in the air.    Such is not actionable negligence, and the trial court was correct in refusing to permit the issue of the alleged defect in the steering gear to be passed upon by the jury "as bearing upon defendants' gross negligence."

First of all, we note, as was pointed out by the trial court in his opinion on plaintiffs' motion for new trial, quoted hereinafter, that prior to trial there had been no assertion of a defective mechanism. Nothing was pleaded as to defective steering gear,

nor was any allusion made thereto in the pretrial statement or its amendment. Obviously, the defect, whatever it was, had assumed no importance prior to trial, despite the extensive pretrial depositions taken, and even now both its cause, and, more importantly, its effects (if any) are shrouded in uncertainty. Unlike the cases cited hereinafter wherein defects in the steering gear linkage, or steering arm, or other, were discovered and brought out upon trial, the materiality of this particular defect remains in the field of speculation. Reference to it appears for the first time in the cross-examination of defendant Szylling, when asked if his car was "in good condition," replied that "it was not in perfect condition," going on to describe the vibration (in the steering wheel) experienced at speeds of "between 40 and 50 miles an hour." As to the severity of such vibration, at some places in the record, Mr. Szylling describes it as "very strong," at others "just trembling in the wheel." His wife describes it in these words: "You don't notice any trembling on the wheel, steering wheel. But, if you touch with your hand, you feel the trembling." A service station had unsuccessfully attempted to remedy by changing the tires. Just what it amounted to, actually, we cannot say, upon the record.

What bearing, if any, did this vibration have upon the accident? From the texts cited by my Brother I would conclude that he analyzes the situation as presenting a problem in proximate cause. This expression, "proximate" cause, has bedeviled the law of torts for years. So much has been written concerning its "true" meaning that it would be a disservice to the profession, and presumptuous, to slay the dragon once more. Suffice to say it has no "true" meaning. It may be made to represent, at will, a number of entirely disparate elements in a negligence case, ranging from cause in fact to apportionment of

damages. "No other formula," writes Dean Green,* "so nearly does the work of Aladdin's lamp." It would advance the cause of justice if a term so chameleonlike were to be abandoned. This is beyond our power. It is too deeply imbedded in the cases and the literature for surgery so drastic. But we should insist that, whenever it is employed, the meaning sought to be ascribed to it be identified. Here it is being used as a synonym for the *sine qua non,* cause in fact.

As to cause in fact, it is not enough to say that the steering gear is important to the safe driving of a car. We know that it is. The brakes are important, also, the tires, and other parts of the mechanism. But it does not raise a jury question that some part of the car's (steering, or brake, or tire, or other) mechanism be shown to be in some degree defective. If so, any accident involving an automobile not in all respects in perfect mechanical condition would automatically go to the jury. This is not the law. There must, in addition, be a showing that the defect was so material and substantial that it was capable of affecting the safe operation of the car, and that it had such effect.

But may not substantial impairment from such source be shown circumstantially? It may, of course, as we pointed out in *Indiana L. M. Ins. Co.* v. *Matthews Stores, Inc.,* 349 Mich 441, but always we come back to the necessity for showing facts, not making conjectures. Thus in *Higgins* v. *Mason,* 255 NY 104, 106 (174 NE 77), the court said:

"Shortly after the occurrence, a piece of rounded metal, 3/4 of an inch in diameter and 1-1/2 inches long, was found near the center of the highway. It proved to be the upper end of a 'spindle pin' or

* Proximate Cause in Texas Negligence Law, 28 Texas L Rev 471, 472.

'pivot pin,' a metal bolt or pin about 7 inches long, which had served to attach the right-hand forward running wheel to the frame of the car, and furnished a pivot upon which there might be made to turn, by the steering mechanism, the running wheel, a short axle, upon which it revolved, and the spindle body, to which the axle was firmly attached."

It was held that a jury issue had been created as to whether the broken spindle pin was the cause, rather than the result, of the accident. Likewise in *Cosgrove* v. *Tracey,* 156 Or 1 (64 P2d 1321), inspection of the car before the accident tended to show "that (1) the drag-link was bent and protruded, (2) that the steering-arm or spindle-arm was bent, (3) that the car steered lightly and went over with a bang." It was held proper "for the court to instruct the jury in effect that they must find 1 or more of the alleged defects of the car caused the car to overturn, or was the proximate cause of the car overturning, in order for plaintiff to recover."

Here, however, we have no such specific showing, no broken or cracked king-pin, linkage, steering arm or wheel. There is neither testimony, nor permissible inference, that any defect in the steering gear had anything to do with this accident. There is, in fact, no showing that the vibration affected the steering. Of course, in a sense any vibration may "affect" the steering just as a man's wearing a collar will "affect" his blood circulation. But the relation we seek must be material and substantial.

There is no testimony, direct or circumstantial, from which a jury would be justified in finding that the vibration substantially affected the steering. There is, to the contrary, testimony that it could not have so done. This testimony concerns the speed of the car at the time of the accident. The vibration described, whatever its degree, was experienced only within a minor range of speeds, namely, at speeds

between 40 and 45 miles per hour. As Mrs. Szylling put it: "Just between 40, 45. Never when it was slower, and never when it was over 45." Mr. Szylling also testified that at speeds higher than 45 miles per hour there was no vibration. But the speed of the car at the time of the accident (and here we quote the brief of the appellants) was, by Mr. Szylling, "estimated at 55 miles per hour" and by disinterested eyewitnesses "between 60 and 65 miles per hour." At such speeds there was no vibration. The range of vibration, it had been established, was between 40 and 45 miles per hour. ("Never when it was over 45," *supra*.)

It will be observed that we have quoted the position of the plaintiffs themselves, the appellants herein, as to the speed of the Szylling car at the time of the accident. Their conclusions are amply justified upon the record. A disinterested witness testified that as Mr. Szylling approached the railroad tracks preceding the curve that he "must have been driving 65 to 70 miles per hour." Mr. Szylling himself testified that he was traveling on the curve at around 55 miles per hour. The State trooper testified that the skid marks indicated "excessive speed."

To what point, then, does my Brother stress that at the point of impact the Szylling car, skidding around the curve that Mr. Szylling says he "noticed * * * too late," had been slowed to 10 or 15 or 5 miles per hour? Actually, if the turkey is to be sliced so thin we might better take the final step and point out that at the exact moment of impact the car was effectively stopped. It was going zero miles per hour. That is why the plaintiffs got hurt. Are we ruling, then, upon a case where a car going aproximately 60 miles per hour is involved in an accident? Or is it a case where a car going 10 to 15 miles per hour is involved in an accident? What is the legal

significance of the 10 to 15 miles per hour argument?

Just this: If a jury question is to be presented on vibration of the steering wheel (assuming for the moment that such vibration in a material way affected the steering), the car must somehow or other be placed in 40–45 miles per hour speed zone in which vibration had been experienced. Obviously it is not in such zone at 60 miles per hour. Equally obvious it is not in it at 15, 10, 5, or zero miles per hour. However, in its deceleration, as the car skidded around the curve and on to impact, it must, for an instant of time, have passed through the 40–45 mile per hour zone. For how long? We are not told. With what effect? Again we are not told. The problem might possibly be solvable by the calculus if we knew the various distances, speeds, and amounts of force applied to the car at various points but these are unknown variables. This much, however, seems to be certain: if such speculations and mathematical mysteries will serve as evidence of sufficient substantial probative value to take a case to the jury we had far better make explicit what is implicit in such holding and say that all negligence cases are to go to the jury hereafter. But of such ruling I will have no part. It is offensive to established constitutional principles, and it abolishes in one stroke the centuries of judicial experience gained as we progressed beyond the uninstructed juries of medieval times.

What actually happened here was simply that the defendant was going too fast to make the curve. The appellants themselves tell us that Mr. Szylling failed to see the sign "indicating a sharp right turn ahead," increased his speed approaching the turn, did not realize there was a turn until actually in it, that he then attempted to turn "but could not do so because of his speed," attempted to apply his brakes,

skidded to the wrong side and hit, on the shoulder, a westbound vehicle.

But we are not yet through with the assumptions necessary if this issue is to go to the jury. That is to say, let us indulge the assumption that the defect in the steering gear materially and substantially interfered with the operation of the car. At this point still another problem remains and that is whether such now-conceded, for sake of argument, substantial and material defect was in truth a cause of the accident. To say that it was involves even a more violent assumption than that last made. For if a driver embarks on a crowded highway in a car completely devoid of any braking power whatsoever, he is not inevitably liable to a guest passenger injured when the car overturns in the roadside ditch. The driver cannot be held negligent on account of faulty brakes if proper brakes would not have prevented the accident, if, for example, the accident were due to the driver's instantaneous death while driving. In such case the absence of brakes would have no causal relation to the accident. There would have been, it is true, foolhardiness in so venturing onto the highway but no actionable negligence, merely negligence in the air. The leading case of *Ford* v. *Trident Fisheries Company,* 232 Mass 400 (122 NE 389), is a case on this point. Here a lifeboat was not kept at the davits ready for instant use, in case of a man overboard. Yet the decedent, who fell overboard, would not have been helped even had such there been, for the testimony showed that he had disappeared instantly upon striking the water and was never seen again. Had the lifeboat in fact been lowered instantly but with a faulty, or, indeed, nonexistent steering gear, the decedent's case would have been no stronger.

Causal connection between defect and accident is a part of the plaintiff's burden. A case cannot go

to a jury supported merely by sheer speculation that something might have been a cause, or, going one step further, that there was a possibility that something was the cause. Mr. Justice Finch, of the New York court of appeals, phrased the doctrine well in the early case of *Taylor* v. *City of Yonkers,* 105 NY 202, 209 (11 NE 642, 59 Am Rep 492), holding, in part:

"The plaintiff slipped upon the ice. That by itself was a sufficient, certain, and operating cause of the fall. No other explanation is needed to account for what happened. It is possible that the slope of the walk had something to do with it. It is equally possible that it did not. There is not a particle of proof that it did. To affirm it is a pure guess and an absolute speculation. Are we to send it to a jury for them to imagine what might have been? The great balance of probability is that the ice was the efficient cause; there is no probability not wholly speculative that the slope was also such."

No less explicit was the opinion of Mr. Justice WIEST in *Frye* v. *City of Detroit,* 256 Mich 466, 469, 470, in holding as follows:

"It was necessary for plaintiff to submit proof, from which the jury could draw the reasonable inference that the death of plaintiff's decedent would not have occurred but for the negligence of defendant city. The plaintiff must go beyond showing that such might have been the case.

"The rule, in negligence cases, is well stated in *Ramberg* v. *Morgan,* 209 Iowa 474, 486, 487 (218 NW 492):

" 'True, it was not necessary for plaintiff to prove the causal connection by direct evidence, but substantial evidence must be furnished upon which a reasonable basis for inference may be made. The proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of

proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts.' "

Those showings made, moreover, must establish that the defect complained of was a substantial factor in bringing about the injury. 2 Restatement, Torts, § 431. Where these showings are not made, either by direct proof or reasonable inference, it is the duty of the court to determine the issue as a matter of law, as was properly done in the case before us. 1 Cooley on Torts (4th ed), § 50.

Appellants urge, finally, that the trial court should have instructed as follows:

24. "CLS 1956, § 257.683 (Stat Ann 1952 Rev § 9.2383) provides that a driver shall not drive an unsafe vehicle upon the highway, that it must be free of all known defects."

The difficulty with this instruction is that it does not state the law. The statute referred to makes it a misdemeanor for—

"any person to drive or move or for the owner to cause or knowingly permit to be driven or moved on any highway any vehicle or combination of vehicles which is in such unsafe condition as to endanger any person, or which does not contain those parts or is not at all times equipped with such lamps and other equipment in proper condition and adjustment as required in this chapter, or which is equipped in any manner in violation of this chapter, or for any person to do any act forbidden or fail to perform any act required under this chapter."*

---

* CLS 1956, § 257.683 (Stat Ann 1952 Rev § 9.2383).

· The effect in a civil action of this criminal statute we need not explore. Before it could have any arguable bearing, whatever such might be, it must first be shown that the vehicle before us was "in such unsafe condition as to endanger any person." This proof is lacking.

Nor do I join in my Brother's criticism, directed toward the element of causation, of the court's reference in instructions to the wind or the road conditions. I find no instruction whatever with reference to the condition of this road. In fact the only road reference is as follows:

"Now, let me tell you the things that are factors in determining gross negligence. Excessive speed in itself is not enough to find a person grossly negligent. There must be other factors. Excessive speed of course, I will tell you, is not ordained entirely by the speed limit on a given piece of highway, but it may consist of failure to use a degree of care commensurate with the situation then and there existing; for instance, a bad road might dictate a slower speed; children running across the road might dictate a slower speed; and you might, in situations such as that, be going less than the speed limit and still be going too fast."

As to the wind conditions the court instructed that the jury could consider (as bearing upon the driver's state of mind) his attitude toward warning, failure to see apparent danger, increase of speed after warning, and, "finally, there is the factor that there was a big wind blowing that day. You can take that into consideration. All of these things, added up, may add up to gross negligence, or they may not. You are the judges of that." The court here is dealing with the conduct of the defendant, his actions, the frame of mind underlying what he did. These elements were proper, indeed necessary, for the jury's evaluation of conduct. But they went only to con-

duct, and criticism thereof in terms of causation is not warranted by either the language used or the context in which they are found.

Lengthy review of the appendices, and the transcript, amply substantiates the ruling of the trial court on these topics, phrased in the following terms:

"The court refused to charge the jury under the provisions of CLS 1956, § 257.683 (Stat Ann 1952 Rev § 9.2383), providing that a driver shall not drive an unsafe vehicle upon the highway, and that it must be free of all known defects, for the reason that there was no testimony in the case which would indicate that the defendants' vehicle was an unsafe vehicle to drive, or that any defect in the vehicle had any causal relation whatsoever to the accident. There was some testimony that the defendants' steering wheel vibrated at speeds between 40 and 45 miles per hour. However, no one claimed that this vibration interfered with defendant driver's steering, or that at the time of the accident he was driving at such a speed. There was no testimony in the case that would entitle the jury conceivably to find any causal relation between this vibration and the accident. Furthermore, plaintiffs in their pleadings did not predicate any liability upon such a claim. In fact, the plaintiffs repeatedly alleged that defendant driver, at the time of the accident, was driving 60 miles an hour."

As to whether a jury verdict of wilful, wanton negligence upon these facts would have been sustained by us was not presented and is not decided.

Affirmed. Costs to appellees.

Kelly, Edwards, and Kavanagh, JJ., concurred with Smith, J.

Dethmers, C. J., and Carr, J., concurred in result.