SCHEDLBAUER *v.* CHRIS-CRAFT CORPORATION.

OPINION OF THE COURT.

1. NEGLIGENCE—PROXIMATE CAUSE—EVIDENCE—QUESTION FOR JURY.
    A basis for determination of causation by a jury exists in a neg-
    ligence action where there is evidence which points to any one
    theory of causation, indicating a logical sequence of cause and
    effect, notwithstanding the existence of other plausible theories
    with or without support in the evidence.

2. SAME—JUDGMENT NOTWITHSTANDING VERDICT—INFERENCES.
    Duty of a trial judge in a negligence action, on motion for judg-
    ment notwithstanding the verdict because proof of causation
    is claimed to be conjectural, is to determine on view favorable
    to the party opposing the motion whether the inference relied
    on by the opposing party is at best equiponderant with the
    other inferences, and only if it is so determined is the trial
    judge justified in granting the motion.

3. SAME—PRODUCT LIABILITY—MANUFACTURERS—WARNING.
    A manufacturer may have a duty to warn against product-
    connected dangers even where the danger associated with the
    product is so slight that few have ever been injured by it.

4. SAME—PRODUCT LIABILITY—DUTY TO WARN—PROXIMATE CAUSE.
    An issue is made for determination by a jury in an action for
    injury resulting from explosion and fire of gasoline in a motor
    cruiser boat, where the record supports the inference that a

REFERENCES FOR POINTS IN HEADNOTES

[1] 38 Am Jur, Negligence § 351.
[2] 30A Am Jur, Judgments § 300.
[3] 46 Am Jur, Sales § 803.
[4] 12 Am Jur 2d, Boats and Boating § 85; 46 Am Jur, Sales § 799
    *et seq.*
[5] 53 Am Jur, Trial §§ 177, 178.
[6, 9] 38 Am Jur, Negligence §§ 290, 344.
[7] 38 Am Jur, Negligence § 285 *et seq.*
[8] 5 Am Jur 2d, Appeal and Error § 726.

malfunctioning fuel pump could have expelled gasoline into the motor cruiser's bilge area and where the manufacturer gave no warning or cautionary notice to buyers and users that a fuel pump might create a hazard if not checked regularly.

5. TRIAL—DIRECTED VERDICT.

A defendant moving for a directed verdict automatically stipulates that, for the purpose of his motion only, the trial judge should look at the case as it appears from the plaintiff's own testimony, unqualified by any which was offered on the part of the defendants, must concede to the plaintiff anything which he could fairly claim upon his evidence, should not be concerned with the question of credibility, and should not select and weigh the evidence.

6. NEGLIGENCE—INFERENCES.

Negligence, like any other fact, may be inferred from circumstances, and though the proof of the plaintiff depends upon inference to establish the main fact, the question of whether the inference suggested by the plaintiff's theory is the correct one, or whether it is sufficiently rebutted by defendant, is for the jury.

7. SAME—EVIDENCE.

Generally the plaintiff who seeks to recover damage for negligence must prove by the most accurate evidence that is reasonably available to him the particular defect or act or omission which he claims was the cause of the injury, especially where the evidence is within his control.

8. SAME—EVIDENCE—OBJECTION—SAVING QUESTION FOR REVIEW.

Failure of plaintiff, in action against manufacturer of boat for damages caused by explosion and fire of gasoline in boat, to produce the engine fuel pump which he claimed caused the explosion and fire by pumping gasoline into the boat bilge through vent holes in the pump, where the action was commenced 2 months after the explosion and the evidence suggests that the fuel pump could have been recovered from the burned boat with little difficulty, is not ground for granting a directed verdict in favor of defendant or a jury instruction upon the presumption which normally arises from the unexplained nonproduction of evidence within the control of a party bearing the burden of proof, where the defendant did not raise the point in the trial court.

9. Negligence—Causation—Evidence.

> Jury verdict must not be based on conjecture, and judgment for defendant notwithstanding a verdict for plaintiff in negligence action against boat manufacturer for furnishing defective fuel pump on boat engine should be upheld on grounds that insufficient evidence to establish causation was presented where there was no evidence tending to establish the defect relied upon by plaintiff and plaintiff's proofs established only that that defect was a possible cause of the injury.

Appeal from Court of Appeals, Division 2, Quinn, P. J., and McGregor and N. J. Kaufman, JJ., affirming Macomb, Spier (James E.), J. Submitted April 2, 1968. (Calendar No. 1, Docket Nos. 51,724, 51,725.) Decided September 25, 1968.

6 Mich App 1, reversed.

Declaration by Wilma Schedlbauer against Chris-Craft Corporation, a Michigan corporation, for personal injuries received in an explosion and fire on a boat. Declaration by Stephen Schedlbauer and State Cyclone Mutual Insurance Company, a Michigan corporation, and American States Insurance Company, an Indiana corporation, his subrogees, for loss of boat and personal property and medical expenses in the same accident. Verdicts for plaintiffs. Judgment notwithstanding verdict entered for defendant in each case. Affirmed by Court of Appeals. Plaintiffs appeal. Reversed and cases remanded for entry of judgments on jury's verdicts.

*Ralph H. Adams*, for plaintiffs.

*Allen, Allen & Shell*, for defendant.

PER CURIAM. In *Kaminski* v. *Grand Trunk W. R. Co.* (1956), 347 Mich 417, all participating Justices agreed to adopt Alabama's test-method of determining what is causally conjectural and what is not when the defendant in negligence moves for an instructed verdict upon allegation that no actionable cause has been shown.[1] To introduce the Alabama rule we said (*Kaminski* at 421):

"It is thus right to say that the trial judge's immediate duty, motion for direction having been made with address to the rule of conjectural choice between equally plausible inferences, is to determine on favorable view of the inference plaintiff relies upon whether it stands equiponderant at best with such as is, or are, urged by the defendant. If the answer is affirmative, then and only then will the judge be justified in proceeding as moved."

In this case plaintiffs obtained a verdict against the defendant in the total sum of $16,750, representing damages for personal injuries, consequential injuries, and insured property losses. Upon motion of defendant for entry of judgment notwithstanding verdict, the trial judge concluded that the cause of the explosion complained of was conjectural only and that plaintiffs had failed to make out a submissible case of actionable causation. Judgment for defendant entered thereupon. February 14, 1967,

---

[1] The Alabama rule, taken from *City of Bessemer* v. *Clowdus* (1954), 261 Ala 388, 394 (74 So 2d 259), reads in *Kaminski* at 422:

"As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."

See discussion of this in *Emery* v. *Chesapeake & Ohio R. Co.* (1964), 372 Mich 663, 683, 684, and *Cummings* v. *Grand Trunk W. R. Co.* (1964), 372 Mich 695, 697, 698.

Division 2 affirmed. 6 Mich App 1. May 4, 1967, plaintiffs' application for leave to appeal was granted. 379 Mich 761.

Contrary to rulings below we hold that plaintiffs have made out a submissible case of actionable negligence. Our disagreement with the circuit court and with Division 2 lies generally in failure of both Courts to accord plaintiffs that full measure of favorable view to which they were entitled upon submission of defendant's said motion, and particularly in their omission of consideration of such proofs as tended to support plaintiffs' claim that the defendant manufacturer was under duty to warn, by some reasonably appropriate means, the buyers and lawful users of correspondingly powered Chris-Craft cruisers that the diaphragm of the fuel pump should be checked regularly and repaired or replaced *as a safety measure.* With abundant citation that duty was stressed when the annotator prepared that part of the brief headed "Liability of manufacturer or seller for injury caused by firearms, explosives, and flammables," 80 ALR2d 488 and subheaded "[b] Warning" (pp 499, 500):

"That the manufacturer's duty of care may include a duty to warn of product-connected dangers is obvious. The duty to warn may exist even where the danger associated with the product is so slight that few have ever been injured by it."[2]

The general detail of the evidentiary facts appears in the opinion of Division 2. To them we add the following:

The cruiser purchased by plaintiffs Schedlbauer is described in the record as a 27-foot Chris-Craft Constellation pleasure boat. The power plant defendant installed in the Constellation class was

---

[2] Cited prominently in support is our case of *Gerkin* v. *Brown & Sehler Co.* (1913), 177 Mich 45 (48 LRA NS 224, 4 NCCA 254).

Chevrolet's standard V-8 automobile engine with AC-manufactured (AC Spark Plug Co.) fuel pump attached. Some modifications of the engine were made to adjust to marine operation, none changing or affecting the fuel and carburetion system, however. The installation was made by bolting the power unit to longitudinal stringers attached to the bottom of the cruiser in the bilge area. The gasoline supply tank was installed aft the engine, and the fuel pump served as in most motor cars to draw gasoline from the supply tank and force it up to the carburetor of the engine. The pump was bolted to the lower portion of the engine. It was activated by an arm working off the engine's camshaft. When the engine is running the arm causes a fibrous neoprene-coated diaphragm to pulsate vertically inside the pump, drawing gasoline into the chamber below the diaphragm and discharging it from that chamber through a tube leading to the carburetor.

It was conceded that if the diaphragm should become pitted and porous through wear, or should actually fracture in small part from repeated flexion in the course of a long continued functioning of the pump, gasoline would be forced out of the pump, into the confined space occupied by the engine, through 2 holes in the pump which AC provided for venting of the pump.

It appears at once that the fuel pump which defendant provided for this Constellation class presents no particular hazard when utilized in an automobile. In that case, if there should be any discharge of gasoline through the 2 vents, it would fall harmlessly to the pavement below and evaporate until the driver or owner comes to realize, on account of rough functioning or outright failure of the motor, that he should head for a garage.

But in the case of corresponding discharge of gasoline into the confined area of a cruiser's below-

deck motor compartment, the gasoline and fumes thereof immediately become what one of the witnesses called "a bomb"; in other words, an imminently explosive hazard in the midst of potent peril of detonation. The pump then may be likened to the thought of proper place rather than misplace which Mr. Justice Sutherland wrote into *Village of Euclid* v. *Ambler Realty Company*, 272 US 365, 388 (47 S Ct 114, 71 L Ed 303, 54 ALR 1016) : "Nuisance may be merely a right thing in the wrong place,— like a pig in the parlor instead of the barnyard."

This brings to the fore plaintiffs' pleaded and briefed contention that defendant should have provided some form of fair warning that the fuel pump thus installed might, if not checked regularly for dependable integrity of the diaphragm, create a grave hazard of marine explosion. Defendant makes no answer to this charge or to the clearly preponderant proof that no pertinent forewarning or cautionary notice to buyers and users of Chris-Craft Constellations was given or issued at any time. That proof made an issue for the jury both of negligence and causation provided there is evidence in the record from which reasonable men might draw fair inference that a malfunction of the fuel pump—as theorized by plaintiffs' expert, Mr. Barr—did cause the explosion of which plaintiffs complain. And since all agree that gasoline provided the explosive force, the controlling question tested by the quoted Alabama rule is whether the jury lawfully could infer that it entered the area of the motor compartment through the fuel pump vents. If so, the issue of negligent causation was properly submitted to the jury; otherwise not.

Refer to that part of the opinion below which sums up Mr. Barr's testimony (6 Mich App at 3, 4). The experiences and tests to which Mr. Barr referred culminated in specific opinions and expert

conclusions which, based as they were upon the previously testified functioning of the motor of the Schedlbauer cruiser *after* as well as before the time of the explosion,[3] fairly indicate "a logical sequence of cause and effect" within the adopted Alabama rule. These opinions and conclusions appear connectedly in the record:

"*Q.* To make it more specific, when the test on this fuel pump that you testified to as being the same as the ones on the 1960 Constellation, when you saw the gasoline coming from the two small holes, how long would the engine run at that time or was it not running?

"*A.* Yes, it was.

"*Q.* All right, now. After making that observation, did you seek to find out what was causing the gas to come from the two small holes?

"*A.* Yes, I did.

"*Q.* And what was the result of your investigation? What did you find?

"*A.* Diaphragm in the top of the pump, the one that pumps the gas to the engine, was pitted. They have a leaded gas that they all use for marine use and automobile use. It's standard gas they use in every power vehicle that they use and they put lead into it to cut down the knock. This lead has a tendency to pit the neoprene diaphragm here and puts little holes in it.

"*Q.* Have you noticed that on many occasions or a few occasions, the pitting of diaphragm?

"*A.* I only had a few of them apart. Usually I replace the whole pump.

"*Q.* You put in the whole pump?

"*A.* Yes.

"*Q.* When you say 'pitting' what do you mean by 'pitting' or 'holes'? What do you mean by that?

"*A.* It's just like acid works. It eats little holes in it.

---

[3] We discuss, *post*, the testimony showing that the motor continued to run after the explosion.

"*Q.* I see. How large would those holes be?

"*A.* Roughly, the size of a pin head.

"*Q.* Now, when that particular pump is in its proper place in the 1960 Constellation and on those occasions that you took the occasion to investigate and found the pitting of the diaphragm where was the gas going when that came out of the two small holes?

"*A.* Into the bilge.

"*Q.* Into the bilge?

"*A.* Yes. It's the only place it can go.   *   *   *

"*(Direct examination, continued)*

"*Q.* All right, now, from the facts that I have given you can you give us an opinion as to what caused the explosion?

*(Objection, discussion, and ruling of the court)*

"*Q.* Do you have such an opinion, sir?

"*A.* Yes, I have.

"*Q.* Would you give it to us firstly?

"*A.* If the fuel tank broke a line it would automatically shut that engine off due to the circumstances I testified to before.

"*Q.* Due to the facts that you have given us, is that right?

"*A.* That's right. It would shut off automatically by itself, the engine would stop running when the engine ran out of fuel because no engine could run without fuel. If the line from the pump itself to the carburetor broke, it would shut off. That leaves this little culprit right here and these two little holes right here. That would be the only other possible explanation for the explosion.

"*Q.* Are you stating the gas came through those little holes into the bilge?

"*A.* Yes.

"*Q.* And also as a part of the question, some of the facts that I gave you, the fact that the engine continued to run for—We know it was an approximation of more than five minutes, is that significant or an important part of your answer?

"*A.* Yes. If you break either one of your lines the engine automatically shuts itself off due to the fact that it runs out of fuel, once it's out of fuel it can't run.

"*Q.* But where would the gas come from if it was a malfunction?

"*A.* It was just getting a partial amount through to the carburetor.

"*Q.* Would it run smoothly or roughly?

"*A.* It would run roughly, erratically.

"*Q.* With gas going into the bilge?

"*A.* Right.

"*Q.* Is it your answer then, you refer to it as this culprit, was the cause the fuel pump?

"*A.* Under the circumstances that you laid out, I would definitely say so.

"*Q.* What would you say was wrong with the fuel pump, rather than just saying it was the cause?

"*A.* These are like a human heart that's been beating nice and strong one minute and then stops. Man, you're dead!

"*Q.* And meaning by that, therefore, the gas gets through the small holes?

"*A.* This diaphragm would itself rupture one way or the other or be pitted to where there is little pin holes through which you get gas which is pumped right out here. As I stated, this is an automotive type fuel pump used on a car that we all have access to. And on an automobile, this type when it goes bad, the gas falls out on the street. In a boat it falls into the bilge and that is the biggest cannon you ever laid your hands on."

The testimony of Mr. Jasper, one of defendant's expert witnesses, blunted the foregoing but did not, of course, cast it out as a matter of law. He testified, on cross-examination:

"*Q.* Have you had occasion, have you, to know that the diaphragm the neoprene diaphragm, when it's in operation in a boat will get pitted?

"*A.* Oh, that would be, that takes a long, long time before anything like that would happen to a diaphragm. In other words, not properly servicing a fuel pump which should be done occasionally might cause it to pit, but I doubt it. I don't think it would wear out.

"*Q.* The wear on it we don't know.

"*A.* That's right.

"*Q.* If it does become pitted—

"*A.* If this pump is malfunctioning you will get a warning.

"*Q.* There will be a warning there is a malfunction?

"*A.* Yes. Before that pump goes out you are going to get a malfunction in your engine.

"*Q.* The engine will run a little rough?

"*A.* Yes.

"*Q.* The engine will start a little rough and gasoline will come through those two holes?

"*A.* The rough engine would indicate there is something wrong.

"*Q.* That's correct. But if the diaphragm is defective at that time, if it had the two holes, gas can come through the two breather holes, can it not?

"*A.* It will. Yes.

"*Q.* And when the gas comes through the breather holes, the fuel will go in the bilge area, would it not?

"*A.* Yes, sir.  *  *  *

"*Q.* Mr. Jasper, in a 1960 Constellation Chris-Craft, taking that boat, if you have gas in the bilge, raw gas in the bilge area, would that be a dangerous condition?

"*A.* Yes, sir.

"*Q.* And would the raw gas in the bilge, with the boat running, isn't it true that raw gas—that you will have gas fumes because of the presence of gas?

"*A.* Yes, sir.

"*Q.* And under those circumstances, depending upon the amount of gas that you have, you could

have an explosion in the bilge area from the gas fumes. Isn't that correct?

"*A.* Why, it's a potential.

"*Q.* Primarily, to have gas in the bilge of this type of boat at any time is a dangerous condition in and of itself?

"*A.* Yes, sir.

"*Q.* And you have just testified that it may take a longer period of time, according to you, that if this diaphragm goes bad you got a rough running engine. You also have gas coming out of these two small holes, is that correct?

"*A.* That is correct.

"*Q.* That goes into the bilge area when it comes through. There is no place it can go. It's going to drop down.

"*A.* It will drop in the bilge, yes."

As against defendant's alternative views of causation (see 6 Mich App at 4, 5) there is proof which—inferentially as in the *Kaminski Case, supra*—lends greater persuasion to plaintiffs' belief that a rupture or ruptures of the diaphragm commenced discharging gasoline into the motor compartment just before the explosion and continued such discharge thereafter until the fire was beyond control and the motor was shut off. That proof consists of testimony of:

(a) the original owner of the cruiser, Mr. Friend, that the motor operated with utmost satisfaction and without repair or need for checkup until he sold it to Mr. Schedlbauer in the spring of 1962;

(b) Mr. Schedlbauer that the motor continued to operate with like satisfaction and no apparent need for checkup until but a few moments prior to the explosion, at which time it began to run "rough";

(c) Mr. Schedlbauer that despite the explosion the motor continued to run while he was momentarily unconscious, as he thereafter attempted to and did extricate his wife from the burning area above and around the motor, and then as he at-

tempted to put out the fire with his own extinguisher and another handed to him by one of the nearby boat occupants;

(d) Mr. Schedlbauer that the motor continued to run as the fire grew hotter until he decided to abandon ship some 5 minutes after the explosion, at which time he shut the motor off, and

(e) Mr. Barr that such continued running of the motor was consistent more with his theory of causation because the pump, with the diaphragm leaking, would continue to force gasoline to the carburetor as it forced gasoline through the vents; whereas if the principal other possibility advanced by defendant had come to pass the motor would be apt to stop shortly for want of fuel entering the carburetor.

It seems that we must constantly remind those interested in negligence law that a motion by the defendant for a directed verdict presents no question of credibility, also that the trial judge may not select among actual or seeming contradictory statements of a witness given on direct examination and cross-examination what he believes should be applied to the motion. Instead, the movant automatically stipulates that, for the purposes of his motion only, the trial judge may and should apply the submitted evidence in that light which our reports have portrayed steadily since these passages appeared a full century ago in the *Van Steinburg Case* (*Detroit & Milwaukee R. Co. v. Van Steinburg* [1868], 17 Mich 99, 117, 118):

"In determining this question, we must look at the case as it appears from the plaintiff's own testimony, unqualified by any which was offered on the part of the defendants, and must concede to him any thing which he could fairly claim upon that evidence. He had a right to ask the jury to believe the case as he presented it; and, however improb-

able some portions of his testimony may appear to us, we can not say that the jury might not have given it full credence. It is for them, and not for the court to compare and weigh the evidence. For the purposes of any positive instructions which one party may demand upon the evidence, he must concede all that his opponent may claim from it."

We conclude that Division 2 erroneously applied to this case the quotations taken by it from the prevailing opinion of the motor accident case of *Glinski* v. *Szylling,* 358 Mich 182, 202, 203 (an opinion indorsed by only 4 of the Justices) and that the rules appearing in unanimous *Schoepper* v. *Hancock Chemical Co.,* 113 Mich 582 (wrongful death action arising from an explosion) should have been considered along with the fact of our having recently applied *Schoepper* to the allegedly conjectural cases of *Emery* and *Cummings,* both *supra. Schoepper* advises (pp 586, 589):

"It is true that where an injury occurs that cannot be accounted for, and where the occasion of it rests wholly in conjecture, the case may fail for want of proof. *Robinson* v. *Charles Wright & Co.,* 94 Mich 283; *Redmond* v. *Delta Lumber Co.,* 96 Mich 545. But such cases are rare, and that rule should never be so extended as to result in a failure of justice, or in denying an injured person a right of action where there is room for balancing the probabilities, and for drawing reasonable inferences better supported upon one side than the other. * * *

"Negligence, like any other fact, may be inferred from circumstances. *Alpern* v. *Churchill,* 53 Mich 607, 613; *Barnowsky* v. *Helson,* 89 Mich 523. And, though the proof of plaintiff depended upon inference to establish the main fact, the question of whether the inference suggested by the plaintiff's theory is the correct one, or whether it was sufficiently rebutted, was for the jury. *Crosby* v. *Detroit, G. H. & M. R. Co.,* 58 Mich 458; *Hagan* v.

*Chicago, D. & C. R. Co.*, 86 Mich 615; *Woods* v. *Detroit & G. T. R. Co.*, 108 Mich 396."

This appeal has brought up a conspicuous characteristic to which we advert lest our opinion above be taken for too much or carried too far. In every action for negligence it is the duty of the plaintiff to prove by the most accurate evidence that is reasonably available to him the particular defect or act or omission which to him was the cause of the injury for which he would recover. (See quotation, *post; Perkins* v. *Township of Delaware*). That is precisely true of evidence which is within his control. Here the plaintiffs have failed to produce the criticized fuel pump. They have failed to offer proof that it has been examined with deposed results. Hence, these actions having been commenced according to theory a bare 2 months after the explosion, question arose whether plaintiffs should have attempted (say with scuba equipment) to attach a line to the burned hull, thereby permitting it to be dragged to the shallow water of the bay for unbolting of the pump and examination thereof. In that regard the photographic exhibits, showing the cruiser as it burned, suggest that location of the hull should have occasioned but little difficulty.

The transcript, however, examined from end to end, fails to show any account or proffer of account for plaintiffs' seeming failure to proceed as above. Had defendant raised this question, either in its motions below or by request for instruction hinged upon that presumption which normally arises from the unexplained nonproduction of evidence within the control of a party bearing the burden of proof, the result here might have been different. Defendant did not raise the point, however, as counsel answered candidly in response to questioning from the bench. We accordingly leave it for some future

case where it has been raised and saved, pointing for the present only to our general rule (*Perkins* v. *Township of Delaware*, 113 Mich 377, 379, followed in *Brown* v. *Detroit United Railway*, 216 Mich 582, 585 and *Baldinger* v. *Ann Arbor R. Co.*, 372 Mich 685, 691):

"It is the duty of the plaintiff who seeks to recover damages for negligence to place before the jury the actual conditions when it is within his power to do so."

The judgments entered for defendant are reversed. The consolidated causes will be remanded to circuit for entry of judgments according to the reported verdict of the jury. Costs of all courts to plaintiffs.

DETHMERS, C. J., and BLACK, T. M. KAVANAGH, O'HARA, ADAMS, and T. E. BRENNAN, JJ., concurred.

KELLY, J. (*dissenting*). The Court of Appeals' written opinion (*Schedlbauer* v. *Chris-Craft Corp.* [1967], 6 Mich App 1, 6–7) concludes as follows:

"The question is whether or not the appellants did establish, by evidence, the source of the leaking gasoline. There is no evidence that the diaphragm was defective. All the experts called by both parties listed it as one of the possibilities, however, there is no proof in the record of the diaphragm being defective.

"Mr. Justice TALBOT SMITH quoted ample authority for the proposition that a jury verdict must be based on more than mere conjecture, in *Glinski* v. *Szylling* (1959), 358 Mich 182, 202:

" 'No less explicit was the opinion of Mr. Justice WIEST in *Frye* v. *City of Detroit*, 256 Mich 466, 469, 470, in holding as follows:

" ' "It was necessary for plaintiff to submit proof, from which the jury could draw the reasonable in-

ference that the death of plaintiff's decedent would not have occurred but for the negligence of defendant city.    The plaintiff must go beyond showing that such might have been the case.

" ' "The rule, in negligence cases, is well stated in *Ramberg* v. *Morgan,* 209 Iowa 474, 486, 487 (218 NW 492):

" ' " 'True, it was not necessary for plaintiff to prove the causal connection by direct evidence, but substantial evidence must be furnished upon which a reasonable basis for inference may be made.    The proof must establish causal connection beyond the point of conjecture.    It must show more than a possibility.    Verdicts must rest upon reasonable certainty of proof.' " '

"It is the opinion of the Court that there was not sufficient evidence upon which a jury verdict could be based.    Accordingly, the lower court's granting of judgment notwithstanding the verdict is affirmed in both cases.    Costs to appellee."

Agreeing with the Court of Appeals, I join that Court in affirming "the lower court's granting of judgment notwithstanding the verdict" in both cases.

The judgment should be affirmed.    Costs to appellee.